## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMITÉ DIALOGO AMBIENTAL, INC.
Urb. Evelymar 914 Calle Pino
Salinas, Puerto Rico, 00751,

ALIANZA COMUNITARIA
AMBIENTALISTA DEL SURESTE, INC.
Calle 2 V35, Villa Universitaria
Humacao, Puerto Rico, 00791,

CAMPAMENTO CONTRA LAS CENIZAS
EN PEÑUELAS, INC.
HC 3 Box 15516
Peñuelas, Puerto Rico, 00624,

CASA TALLABOEÑA DE FORMACIÓN
COMUNITARIA Y RESILIENCIA, INC.
HC 3 Box 15516
Peñuelas, Puerto Rico, 00624,

CENTER FOR BIOLOGICAL DIVERSITY,
1411 K St. NW, Suite 1300
Washington, D.C. 20005,

COMITÉ CABORROJEÑO PRO SALUD Y
AMBIENTE, INC.
PO Box 1789
Cabo Rojo, Puerto Rico, 00623,

COMITÉ YABUCOEÑO PRO-CALIDAD
DE VIDA, INC.
HC 4 Box 6901
Yabucoa, Puerto Rico, 00767,

EL PUENTE DE WILLIAMSBURG, INC.
145 Ave. Hostos, Monte Sur Townhouses,
G409,
San Juan, Puerto Rico, 00918,

and

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Civil Action No.: _____

1

FRENTE UNIDO PRO-DEFENSA DEL
VALLE DE LAJAS, INC.
Apartado 3138,
Lajas, Puerto Rico, 00667,

       *Plaintiffs*,
    v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY,
500 C Street SW
Washington, DC 20472,

DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King Jr. Ave. SE
Washington, D.C., 20528,

DEANNE CRISWELL, Administrator,
Federal Emergency Management Agency
500 C Street, SW
Washington, D.C., 20472,

and

ALEJANDRO MAYORKAS, Secretary,
Department of Homeland Security
2707 Martin Luther King Jr. Ave. SE
Washington, D.C., 20528

       *Defendants*.

## I.      INTRODUCTION

1. This case challenges the failure of the Department of Homeland Security ("DHS") and its component agency the Federal Emergency Management Agency ("FEMA") to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in connection with two projects related to restoring electric service throughout Puerto Rico—the Puerto Rico Fossil Grid Entrenchment Project and the Puerto Rico Public Facilities Project. Although FEMA has prepared two separate Programmatic Environmental Assessments ("PEAs") on these projects,

they have fundamentally failed to address the environmental impacts of the projects, or to consider reasonable alternatives in the manner required by NEPA and the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* Most notably, the PEAs fail to meaningfully consider relying on distributed renewable energy systems like rooftop solar and storage to provide disaster-resilient and reliable electricity across Puerto Rico, an alternative supported by both federal technical studies and the Puerto Rican public.

2. In September 2022, Hurricane Fiona battered Puerto Rico, producing heavy flooding and landslides, and knocking out the archipelago's entire electricity grid. Fiona is the latest in a series of devastating storms that have ravaged Puerto Rico and its highly vulnerable, centralized, and fossil fuel-reliant electric system. Hurricane Maria, the second of two hurricanes that hit Puerto Rico in September 2017, also caused a complete blackout (the largest blackout in U.S. history) and killed thousands of people. Many died after the storm, when they were unable to run life-saving medical equipment or refrigerate life-saving medicine because they had no access to electricity.

3. It took nearly one year to fully restore power to all customers in Puerto Rico after Maria. The public health effects associated with the blackout were devastating. The lack of electricity meant that water pumping and treatment stations were knocked out, resulting in residents lacking access to clean and safe water. Hospital care also suffered. Most hospitals had only limited access to scarce fuel with which to run fossil fuel generators. Even months after the storm, almost half of all hospitals were still running on generators, resulting in only intermittent power and the need to delay surgeries and other critical medical treatments or conduct them by flashlight.

4. Recent hurricanes in Puerto Rico have dropped tremendous amounts of rain, particularly in the mountainous central part of the main island, which received almost a quarter of its annual rainfall in just one day when Hurricane Maria hit. Scientists have concluded that Hurricane Maria's record-setting rains were directly connected to climate change.

5. Puerto Rico's centralized, fossil fuel-based electric grid is particularly susceptible to damage from the devastating storms that the climate crisis is bringing to the archipelago with increasing intensity. Most of Puerto Rico's electricity generation capacity is located on the southern part of the main island, while most of the electricity demand is in the north. High voltage transmission lines must traverse long distances through the mountainous and heavily vegetated terrain in between. These power lines are vulnerable to damage due to the high winds and floods that hurricanes bring, and damage at only a few points can knock out power to large areas and take a long time to repair.

6. Numerous technical studies have shown that distributed renewable energy resources—in other words, renewable generation sources like rooftop solar or solar microgrids that generate electricity at or near the place of use—can meet Puerto Rico's energy needs while reducing the overall need for this kind of large-scale, centralized power infrastructure that lacks resilience during disasters and other events. For example, in January, 2023, DOE released an interim report for its Puerto Rico Grid Resilience and Transition to 100% Renewable Energy Study ("PR100 Study")—a study FEMA is funding—finding that 1) Puerto Rico has more than enough renewable energy potential to fulfill all of the archipelago's electricity needs through 2050; and 2) all scenarios for meeting Puerto Rico's current renewable energy goals require significant investment in rooftop solar.

7. Puerto Rico has set aggressive renewable energy targets, passing a landmark law in 2019 requiring that 100% of the territory's electricity come from renewable sources by 2050. In 2020, Puerto Rican experts and community organizations issued their own energy plan that centered distributed renewable energy systems to achieve the 2019 legislative target. The 2023 interim report for the PR100 Study also found that Puerto Ricans prefer distributed energy resources over centralized power because they are more disaster-resilient and reliable and preserve scarce agricultural land necessary for farming.

8. The existing system's dependence on fossil fuels only further increases its vulnerability because it contributes to the increasing severity and frequency of the very storms that threaten it. Distributed renewable energy like rooftop solar, by contrast, does not contribute to fossil fuel pollution, and has resilience benefits as well. Rooftop and community solar with storage have repeatedly demonstrated their ability to keep the lights on during storms.

9. This is the context in which DHS and FEMA (hereafter collectively referred to as simply FEMA) have been deciding how to channel billions of dollars in federal disaster aid for Puerto Rico, including aid to restore electricity. That restoration work has focused on repairing, reconstructing, and relocating Puerto Rico's outdated, inefficient, and centralized fossil fuel-based electricity infrastructure (hereafter the "Puerto Rico Fossil Grid Entrenchment Project" or "the Fossil Entrenchment Project"), and meeting the power needs specific to public government facilities (hereafter the "Puerto Rico Public Facilities Project" or "the Public Facilities Project").

10. In August 2020, FEMA issued a Draft Programmatic Environmental Assessment for the Puerto Rico Fossil Grid Entrenchment Project, which it finalized in June 2021 ("Fossil Entrenchment PEA"). The Fossil Entrenchment Project includes repair, replacement, and relocation of Puerto Rico's centralized power infrastructure, including transmission lines, towers,

poles, substations, and distribution feeders (collectively "T&D") that transfer energy from power plant facilities to homes and businesses.

11. The Fossil Entrenchment PEA primarily considers mechanisms for repairing and relocating preexisting T&D infrastructure. It does not consider reasonable alternatives in which Puerto Rico's electricity needs might be met with distributed renewable energy such as rooftop solar and battery storage, which would be more resilient to damage from climate change-fueled storms.

12. In July 2022, FEMA issued another Draft PEA, this one for the Public Facilities Project, which it finalized in December 2022 ("Public Facilities PEA"). The Public Facilities Project addresses the electric power needs specific to various public facilities in Puerto Rico. With regard to electricity access, the Public Facilities Project focuses primarily on ensuring these facilities have continued access to the centralized fossil fuel power system.

13. Neither PEA addresses a central issue raised in comments: rebuilding Puerto Rico's electricity system to rely on distributed energy like solar and microgrids, which can provide communities in Puerto Rico with more resilient electricity than the unreliable, and polluting centralized fossil-fueled grid can. Likewise, neither PEA meaningfully assesses the public health, air, land, and water pollution impacts from the construction, relocation, and operation of the fossil fuel-supporting activities that they will fund. Further, neither PEA adequately considers— and the first PEA does not even mention—the climate crisis, the enhanced climate risk Puerto Rico faces, and thus the urgent need to build clean and resilient infrastructure now instead of adding to the problem.

14. The PEAs also fail to adequately consider the environmental justice impacts of FEMA's decision to invest billions of dollars in rebuilding, relocating, and perpetuating Puerto

Rico's centralized, fossil fuel-based electricity grid, and likewise in perpetuating the dependence of public facilities in Puerto Rico on that grid. They do not consider how environmental justice communities in Puerto Rico will be disproportionately harmed by the continued vulnerability of this centralized system and the pollution from the construction, relocation, and operation of fossil fuel activities under the projects.

15. The PEAs also largely dismiss impacts that activities funded will have on threatened and endangered species and their habitats, despite FEMA's own acknowledgement that such impacts will or are likely to occur. Puerto Rico is an ecologically rich archipelago, with coasts, wetlands, waterways, dunes, and forests that support significant biodiversity, provide critical habitat for numerous threatened and endangered species, such as the iconic Puerto Rican Parrot, and provide both economic and recreational value. The projects described in both PEAs would cause tremendous damage to all these invaluable natural environments.

16. Public comments identified these flaws, urging FEMA to prepare an Environmental Impact Statement ("EIS") and, in the case of the Public Facilities PEA, specifically urging FEMA to prepare a single comprehensive EIS for its entire project to repair Puerto Rico's electricity grid and its public facilities' interconnections with that grid. Nonetheless, in the summer of 2021 FEMA finalized the Fossil Grid PEA and issued a Finding of No Significant Impact ("FONSI"), and in December 2022, FEMA likewise finalized the Public Facilities PEA and issued a FONSI.

17. On January 6, 2023, Plaintiffs sent FEMA a letter urging the agency to reopen the NEPA process in light of new information bearing on environmental concerns since the first FONSI was issued more than eighteen months ago. On January 25, 2023, FEMA denied Plaintiffs' call for further NEPA review.

18. In this action, Plaintiffs seek an order vacating FEMA's Fossil Entrenchment PEA and FONSI and its Public Facilities PEA and FONSI, and ordering FEMA to prepare a single EIS on these projects.

## II.       JURISDICTION & VENUE

19. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as Defendant), and 5 U.S.C. § 702.

20. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1540(g).

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## III.      PARTIES

22. Plaintiff Comité Dialogo Ambiental, Inc. ("CDA") is a community environmental group of residents of the Municipality of Salinas and the Guayama Region organized in 1997 as a nonprofit corporation under the Commonwealth of Puerto Rico law. CDA's purpose is to protect and restore the environment of the communities it serves and to promote conditions under which human beings and the environment can exist in harmony to fulfill economic, social, and other needs of present and future generations. CDA engages in education and community organizing around the adverse impacts of human activities on the ecologic balance of natural systems.

23. CDA is harmed by electric system infrastructure—including fossil-fired power plants, utility scale renewable energy projects, and centralized transmission and distribution systems— as well as by frequent power outages. The organization is concerned about adverse impacts on communities, agricultural land, water, and other natural resources.

8

24. For example, one activist who is part of CDA, Hery Colon, lives near the Aguirre Power Complex in Salinas, Puerto Rico. One of his earliest memories is a large explosion there. He frequently suffers significant noise pollution from the complex, and has changed his habits of walking in his neighborhood, fishing, and enjoying the coast, because he is concerned about how toxic emissions from the Complex may harm his health. He also suffers from frequent power outages that impact his ability to work, and result in the spoiling of expensive groceries that he and his family cannot afford to lose.

25. CDA promotes alternatives to centralized, fossil-fired generation, distribution, and transmission, including rooftop solar installations, solar communities, and renewable energy microgrids, as well as energy storage, properly sited utility scale renewable generation, and solar installations at schools, water purification and treatment plants, parking lots and similar areas.

26. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm CDA and its interests in a more sustainable and healthier energy future.

27. Plaintiff Alianza Comunitaria Ambientalista del Sureste, Inc. ("ACASE") is a non-profit community and environmental organization working primarily in the Humacao, Yabucoa, Las Piedras, Caguas, and Patillas municipalities in Puerto Rico. ACASE was created in 2015 in response to the disposal of coal ash in the Humacao landfill. ACASE raises awareness in the communities of Humacao and neighboring towns of the health impacts from fossil fuel pollution, including coal combustion and coal ash.

28. ACASE also engages in policy advocacy to advance the transition in Puerto Rico away from burning fossil fuels to generate electricity. For example, in 2019 ACASE was part of

a coalition of environmental and community groups that intervened in an Electric Power Authority proceeding relating to methane gas terminals in Mayagüez and Yabucoa, alleging that the Power Authority had failed to adequately consider the risks posed by flammable liquified natural gas. ACASE also does considerable community outreach and education efforts related to the dangers of fossil fuel-based energy and the possibilities for a clean renewable energy future for Puerto Rico.

29. Many of the communities ACASE works with and represents are near, and are impacted by, fossil fuel facilities and associated infrastructure, including the AES coal fired power plant. They are also harmed by frequent power outages. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm ACASE and its interests in a more sustainable and healthier energy future.

30. Plaintiff Campamento Contra las Cenizas en Peñuelas, Inc. ("Campamento") is a community and environmental non-profit organization formed in 2014 and dedicated to the fight against combustion residue from fossil fuel energy generation. Its mission is to raise community awareness about the dangers from toxic coal ash and the urgent need to end coal combustion in Puerto Rico.

31. The communities Campamento works with and represents are primarily in and around Peñuelas, Puerto Rico, and the group initially formed to oppose the deposit of toxic coal ash from the AES coal plant. There are multiple fossil fuel-fired power plants and petrochemical plants near Peñuelas, and the communities Campamento works with suffer the effects of pollution from these facilities. They are also harmed by frequent power outages. Through its

advocacy, Campamento seeks to reduce harmful pollution from fossil fuel-based power facilities and to promote access to clean, renewable sources of electricity, especially for low-income residents.

32. Campamento is harmed by fossil fuel pollution and by unequal access to renewable sources of electricity. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Campamento and its interests in a more sustainable and healthier energy future.

33. Plaintiff Casa Tallaboeña de Formación Comunitaria y Resiliencia ("Casa Tallaboeña") is a community-based organization operating since 2019 and dedicated to promoting social well-being by providing a first response to natural disasters and other crises in marginalized communities in and around Peñuelas, Puerto Rico.

34. Casa Tallaboeña first formed in the wake of Hurricane Maria, when communities near Peñuelas were profoundly affected by the blackouts that followed the storm and in need of an immediate emergency response. Many of these communities continue to be harmed by frequent power outages. Casa Tallaboeña promotes community empowerment by providing first response training and education that allows communities—particularly poor and rural communities in the Peñuelas region—to be more resilient in the face of storms and other natural disasters.

35. Casa Tallaboeña cares deeply about affordable and just access to rooftop solar and other forms of distributed renewable energy because the poor and remote communities Casa Tallaboeña works with are often the last to have electricity restored following a disaster and therefore suffer the most severe consequences. Casa Tallaboeña is harmed by unequal access to

resilient and clean renewable sources of electricity. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Casa Tallaboeña and its interests in a more sustainable and healthier energy future.

36. Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit conservation organization with offices throughout the United States. The Center has more than 89,000 members, including members who live in Puerto Rico. The Center's members care about the country's urgent need to expedite the renewable energy transition, as well as about protecting human health, the natural environment, and threatened and endangered species from the ravages of the climate emergency and environmental degradation. The Center's Energy Justice Program focuses on advancing environmental and energy justice, and specifically fights to transition the electricity sector to renewable and resilient energy for a climate-safe and just future.

37. The Center has long worked on the vital and just transition of the Nation's energy sector away from fossil fuels and towards renewable and just energy systems. The Center advocates for the deployment of democratic and distributed clean power that protects low-wealth communities and communities of color, which disproportionately bear the brunt of the harm from fossil fuel pollution and centralized power monopolies. The Center also has a longstanding interest in the conservation of threatened and endangered species in Puerto Rico. For example, the Center petitioned to protect Puerto Rico's elkhorn and staghorn corals under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and it has also undertaken legal work to secure critical habitat protection and recovery plans for corals. The Center has also worked to protect habitat for other Caribbean wildlife and to reduce the risks to whales from vessel noise and ship strikes.

38. The Center brings this action on behalf of itself and its members. The Center has members who are impacted by pollution from fossil fuel-based electricity generation, transmission, or distribution infrastructure in Puerto Rico, and are also impacted by frequent and prolonged electricity outages in the archipelago. For example, one Center member, Frank Gonzalez Garcia, lives within a few miles of two major fossil fuel-fired power plants. He sometimes suffers from smelling noxious odors from these facilities in his home, and he worries about how the pollution they produce impacts his neighbors' health and downwind communities. He has also been impacted by frequent power outages and has family members who struggle with exorbitant power bills.

39. The activities FEMA will fund pursuant to the Fossil Entrenchment PEA and the Public Facilities PEA will result in further investment in the dirty and unreliable fossil fuel-based electricity system in Puerto Rico, and will therefore result in Center members continuing to experience the adverse effects of the resulting pollution and power outages.

40. The Center also has members who live near or regularly visit Puerto Rico's national parks, forests, rivers, wetlands, and coasts to hike, recreate, observe wildlife, boat, swim, beachcomb, sightsee, study, or take pictures. These Center members derive recreational and aesthetic enjoyment, as well as physical and mental health benefits, from their activities in these areas. Their enjoyment of these precious places depends on the health and condition of the ecosystems that exist in these areas, as well as on the health and condition of the wildlife that live and migrate through them.

41. The activities FEMA will fund pursuant to the Fossil Entrenchment PEA and the Public Facilities PEA will involve the construction and ongoing operation of numerous utility and related projects that will pollute the air, land, and water of many of the natural environments

and ecosystems throughout Puerto Rico that the archipelago's electricity grid and public facility infrastructure traverse, and that Center members visit and plan to visit in the future. FEMA's Fossil Entrenchment Project and its Public Facilities Project will therefore adversely affect Center members and harm wildlife and habitats Center members enjoy visiting and observing.

42. Plaintiff Comité Caborrojeño Pro Salud y Ambiente, Inc. ("Caborrojeños") is a community-based organization operating since 1991, whose mission is to advance the preservation of the natural resources of the city of Cabo Rojo, Puerto Rico, and of the archipelago as a whole.

43. Caborrojeños primarily carries out its mission through community education. For example, the organization operates a Visitors' Center at the Cabo Rojo National Fish and Wildlife Refuge, where they offer school children and other visitors educational films about the Refuge's birds, information about the ecological and geological importance of the nearby salt flats, and walks through habitats in the refuge. Caborrojeños has also at times participated in public hearings to advocate against the granting of land use permits that harm the natural resources it seeks to protect.

44. Caborrojeños is deeply committed to shifting from a petroleum-based electricity production system in Puerto Rico to one based on clean, distributed renewable energy resources, and the organization works to educate the public about the need for this change. Caborrojeños is harmed by the pollution and environmental degradation from fossil fuel power plants, transmission lines, and other associated infrastructure. Caborrojeños is also harmed by frequent power outages, and such outages also impede Caborrojeños' ability to operate its Visitors' Center and carry out its mission. By further entrenching Puerto Rico's energy system's reliance

on fossil fuels, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Caborrojeños and its interests in a more resilient and just energy future.

45. Plaintiff Comité Yabucoeño Pro-Calidad de Vida, Inc. ("YUCAE") is a non-profit, community-based group established in 1988, whose mission includes promoting sustainable development, and protecting green infrastructure, parks, nature reserves, and agricultural land in Yabucoa, Puerto Rico. YUCAE first formed in order to address pollution problems from fossil fuels in Yabucoa and particular concerns about the health of students in schools.

46. An important part of YUCAE's work involves community organizing and education about the health effects of fossil fuel pollution. The organization also works to promote renewable energy, particularly rooftop solar since it avoids harms to agricultural lands and important nature reserves near Yabucoa as well as harms from frequent power outages. YUCAE is currently working on projects to help a number of individual households and a local school get rooftop solar installed.

47. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm YUCAE and its interests in a more sustainable and healthier energy future.

48. Plaintiff El Puente de Williamsburg, Inc. ("El Puente") is a nonprofit organization with offices in Puerto Rico and Brooklyn, New York. In New York, El Puente founded the Community Alliance for the Environment and co-founded the New York City Environmental Justice Alliance. Its Puerto Rico program, Latino Climate Action Network, is comprised of a group of Puerto Rican residents concerned about the impacts of air pollution and climate change in Puerto Rico.

49. In 2013, El Puente led a campaign that fostered the Governor's signature on five Executive Orders in support of climate mitigation and adaptation that, taken collectively, lead all stateside governors' actions regarding climate change policy and paved the way for the approval of Act 33-2019, the Puerto Rico Climate Change, Mitigation, Adaptation, and Resiliency Act. El Puente seeks to build community sustainability through strategies to mitigate and plan for climate change. The organization works with communities affected by Hurricane Maria and other environmental crises by providing support and resources, including supplies and efforts to transform communities to sustainable solar energy. Through community organizing and policy advocacy, El Puente promotes environmental justice and climate change preparedness and prevention. El Puente has long made efforts to address planning for climate change, sea level rise, food security, water availability, and the impacts of power generation on climate change.

50. Some of the communities El Puente works with and represents are near, and are impacted by, fossil fuel facilities, including LNG terminal facilities in San Juan Bay. These facilities adversely impact physical and mental health in these communities, as well as their residents' enjoyment of their neighborhoods, coast, and bay. Many of these communities are also harmed by frequent power outages.

51. For example, one activist participating with El Puente, Federico Cintrón Moscoso, lives a few hundred feet from an electricity substation, and also lives and works near both the San Juan Power Plant and the New Fortress LNG Terminal. Observing all this fossil fuel infrastructure, and construction on it, significantly diminishes his enjoyment of his environment and the natural landscape around him. Further, because much of this infrastructure is unstable and vulnerable to the tropical weather conditions in Puerto Rico, he often feels unsafe walking around his neighborhood.

52. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm El Puente and its interests in a more sustainable and healthier energy future.

53. Plaintiff Frente Unido Pro-Defensa del Valle de Lajas ("Frente Unido") is a community-based conservation organization that has been operating since 1995. Frente Unido works to protect farmland in the Lajas Valley and elsewhere in Puerto Rico, to advocate for rooftop solar as an energy solution in the Valley and throughout Puerto Rico, and to improve the quality of life for the Valley's residents. Frente Unido is concerned about the significant threat to agricultural lands in Puerto Rico posed by utility-scale renewable energy projects, and many of the communities the organization works with and represents are also harmed by frequent power outages. Frente Unido advocates for rooftop solar as an energy alternative in the archipelago, and has also engaged in litigation and intervened in regulatory proceedings regarding utility-scale renewable energy projects as part of various coalitions.

54. By further entrenching Puerto Rico's energy systems' reliance on fossil fuels, and by impeding a rapid transition to clean renewable energy in Puerto Rico, FEMA's Puerto Rico Fossil Grid Entrenchment Project and its Puerto Rico Public Facilities Project harm Frente Unido and its interests in a more sustainable and healthier energy future.

55. Defendant Federal Emergency Management Agency is an agency of the federal government within the U.S. Department of Homeland Security whose mission is "helping people before, during and after disasters."

56. Defendant Department of Homeland Security is an agency of the federal government that is the parent agency of FEMA, whose mission includes "relentless resilience, . . . responding

17

decisively to man-made and natural disasters, and advancing American prosperity and economic security long into the future."

57. Defendant Deanne Criswell is the Administrator of the Federal Emergency Management Agency and is the official responsible for FEMA's compliance with federal environmental laws, including NEPA and the Administrative Procedure Act.

58. Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security, and is the official ultimately responsible for the supervision, management, and control of FEMA's activities and its compliance with applicable laws.

## IV.  STATUTORY BACKGROUND

### A.  The National Environmental Policy Act

59. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA implementing procedures are intended to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* at §1500.1(b). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA that are binding on all agencies. Executive Order No. 11991 (May 24, 1977), 40 C.F.R. § 1500.3.

60. In promulgating NEPA, Congress stressed that it is "[t]he continuing responsibility of the Federal government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may," among other things, "[f]ulfill the responsibilities of each generation as trustees of the environment for succeeding generations," attain the widest range of beneficial uses of the environment while avoiding environmental degradation and risks to health and safety, and enhance the quality of renewable resources. 42 U.S.C. § 4331(b).

61. In order to achieve these goals, NEPA mandates that all federal agencies prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C §4332(2)(C).

62. NEPA's implementing regulations establish several criteria for determining whether an impact may be significant, thereby requiring an EIS. Among these are: "the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area such as proximity to ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may establish a precedent for future actions with significant effects; whether the action is related to other actions with cumulatively significant impacts, and; the degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b). If an action may have a significant effect on the environment an EIS must be prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. When an agency is uncertain whether an activity will have a significant impact on the environment and, thus, whether it must prepare an EIS, the agency may prepare an Environmental Assessment ("EA") to assist it in making this determination. 40 C.F.R. §§ 1501.3, 1501.4(b)-(c). An EA either supports a finding that an EIS must be prepared, or a FONSI.

63. Regardless of whether an agency is preparing an EA or an EIS, the agency must specify the underlying purpose and need to which its proposed action is responding. 40 C.F.R. §§ 1501.5, 1502.13. It must also take a "hard look" at the environmental impacts of the proposed action and alternatives. 40 C.F.R. §§ 1501.5, 1502.14. Although the agency may support a FONSI by including concrete and specific mitigation measures as part of a project design in

order to achieve an environmentally preferable result, such measures must be effective and certain to occur in order to qualify. See 40 C.F.R. § 1501.6(c).

64. If an action will or may significantly affect the human environment, then the agency must prepare an EIS—a more comprehensive document than an EA. The "heart" of the EIS is the assessment of a range of alternatives to the proposed action. 40 C.F.R. §1502.14. An EIS must rigorously explore and objectively evaluate all reasonable alternatives, including alternatives not within the jurisdiction of the lead agency.

65. An EIS must discuss the environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. 40 C.F.R. § 1502.16. In discussing impacts, an EIS must address a proposed action's direct, indirect, and cumulative impacts and their significance. *Id.* §1508.25. The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. *Id.* § 1508.8. Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur. *Id.* § 1508.7. A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

66. Federal agencies must also consider environmental justice—the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies— in their activities under NEPA. During the NEPA process, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States . . . ." Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).

67. Once a NEPA review is completed, the CEQ regulations require that an agency supplement the analysis if the agency "makes substantial changes to the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d).

## B.  The Stafford Act

68. The Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1974, 42 U.S.C. § 5121 *et seq.*, provides the primary statutory basis for most of FEMA's disaster response activities, and the provision of public assistance to affected communities.

69. The Stafford Act authorizes the President to issue a major disaster declaration, such as the ones that were issued for Puerto Rico following Hurricanes Maria and Fiona. In passing the Stafford Act, Congress was explicit that its purpose was to address the "loss of life, human suffering, loss of income, and property loss and damage" that disasters often cause, as well as the

severe adverse effects they can have on governments, communities, individuals, and families. 42 U.S.C. § 5121(a).

70. The original Act also made clear that preparedness and mitigation should be an important focus of the federal response that an emergency or major disaster declaration triggers. Section 101 of the Act states: "It is the intent of Congress, by this Act, to provide an orderly and continuing means of assistance . . . to alleviate the suffering and damage which result from such disasters by . . . encouraging the development of comprehensive disaster preparedness . . . [and by] encouraging hazard mitigation measures to reduce losses from disasters . . . ." 42 U.S.C. § 5121 (b).

71. Congress expanded FEMA's mission in 2006, directing the agency to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(b). In 2017, Congress further expanded FEMA's mission to broaden federal investments into mitigation efforts that protect public infrastructure and strengthen both FEMA's public assistance and individual assistance programs. Disaster Recovery Reform Act, Pub. L. 115-254, 123 Stat. 3438.

72. FEMA itself has acknowledged that the climate crisis is increasing the likelihood of a range of threats, explaining that risks and hazards "including extreme heat, drought, flooding, and wildfires . . . are often exacerbated by climate change," and identifying FEMA's key role in helping communities "plan for, mitigate against, respond to, and recover from the adverse impacts of climate change."

22

V.      **FACTUAL BACKGROUND**

A.      **The Hurricanes That Continue to Devastate Puerto Rico and the Opportunity to Rebuild a More Resilient Electricity Delivery System in the Wake of Disaster.**

73. In early September 2017, Hurricane Irma approached Puerto Rico's northern coast as a Category 5 storm, knocking out power to over 1 million residents, and causing hundreds of millions of dollars in damage. Roughly 2 weeks later, Hurricane Maria hit Puerto Rico as a Category 4 storm, killing thousands of people, causing an estimated $100 billion in damage, and completely knocking out power for the entire archipelago.

74. The Puerto Rico Electric Power Authority ("PREPA"), Puerto Rico's electric utility which at that time owned and operated electric generation, transmission, and distribution facilities serving the island, was still working on restoring power to customers who lost it as a result of Hurricane Irma when Hurricane Maria hit. Among many things, Maria significantly damaged PREPA's distribution network of electric power lines carrying fossil-fueled electricity. The result was a system-wide collapse that caused the largest blackout in U.S. history.

75. Only a few years later, in January of 2020, while Puerto Rico was still recovering from the 2017 hurricanes, a magnitude 6.4 earthquake struck, again wrecked electric transmission lines, and plunged almost the entire archipelago back into another blackout.

76. Some of the most extensive damage to the grid from these catastrophes has been to Puerto Rico's transmission lines. A significant portion of the electricity generation assets in the archipelago are located in the south part of the main island, while the most significant demand center is located on the main island's northern coast, across a mountainous inland region. As a result, many of the transmission lines pass through difficult to access and heavily vegetated mountain regions, resulting in increased damage to transmission infrastructure when storms hit, and long restoration times when damage results in power outages.

23

77. The Federal Government issued a major disaster declaration after the hurricanes, authorizing FEMA to allocate funds for federal disaster assistance.

78. In September of 2020, FEMA approved nearly $10 billion to PREPA for the rebuilding of Puerto Rico's power grid. In June of 2022, that total rose to roughly $12.8 billion.

79. Nonetheless, on information and belief, to date only a small fraction of that money has been spent, and an even smaller proportion has been spent on permanent works. Years later, Puerto Rico's centralized power grid remains extremely vulnerable to disaster and unreliable.

80. Distributed renewable energy resources, including rooftop solar and solar microgrids, offer an alternative approach for addressing these problems. These resources do not depend on large-scale transmission lines, do not require electricity to be transported over long distances, and—particularly when paired with battery storage—can operate even when grid failures do occur, in the case of disasters. The viability and effectiveness of these technologies as a solution in Puerto Rico has been demonstrated repeatedly in technical studies. In the aftermath of the hurricanes, a 2018 Department of Energy report recommended exploring segmentation, microgrids, and a focus on renewable energy and energy efficiency in Puerto Rico. In 2020, a National Renewable Energy Laboratory study concluded that rooftop solar generation could generate vastly more electricity than all of Puerto Rico's consumption needs and could reduce the overall need for energy transmission and distribution on the islands. A 2021 analysis by Cambio PR and the Institute for Energy Economics and Financial Analysis found that:

- achieving 75% distributed renewable energy generation in Puerto Rico within 15 years is feasible with minimal upgrades to the distribution system;

- equipping 100% of homes with 2.7 kW PV and 12.6 kWh battery backup could provide 2700MW of power to the Puerto Rico grid;

- achieving 75% distributed renewable energy by 2035 would cut imported fossil fuel costs to $430 million/year (relative to recent expenditures over $1.4 billion/year) and would reduce carbon dioxide emissions by more than 70%; and

- a 75% distributed renewable energy scenario is less expensive than the current grid.

81. Puerto Rico has also set aggressive renewable energy targets, passing landmark laws in 2019 requiring that 20% of the territory's electricity come from renewable sources by 2022, 40% by 2025, 60% by 2040, and 100% by 2050. In 2020, Puerto Rican experts and community organizations issued their own energy plan that centered distributed renewable energy systems to achieve the 2019 legislative target.

82. Despite these findings, and despite the allocation of over $10 billion in federal funds from FEMA to repair damage to the electric system, that funding has not been used for distributed renewable energy projects. Instead, FEMA's focus has remained on repairing, rebuilding, and relocating Puerto Rico's outdated, centralized electrical grid, and on perpetuating the dependence of Puerto Rico's critical public facilities on that grid. Contrary to Puerto Rico's target of 20% of electricity coming from renewables by 2022, the actual number for that year was roughly 3%.

### B.    The History of Problems with Puerto Rico's Centralized Electricity Grid

83. PREPA, which, as referenced above, was, at the time Hurricane Maria hit, the publicly owned monopoly responsible for electricity generation, transmission, and distribution in Puerto Rico, was already suffering significant financial troubles before the storm. In July 2017, two months prior to Maria, PREPA effectively filed for bankruptcy.

84. After the blackout caused by the hurricane, mismanagement problems only compounded. PREPA approved a $300 million no-bid contract with a Montana-based company called Whitefish Energy to rebuild the grid, despite the fact that Whitefish Energy was a small company with limited disaster-relief experience.

85. Problems persisted, and in June 2021, the government of Puerto Rico contracted with a private company, LUMA Energy ("LUMA"), to take over transmission and distribution of electricity in the archipelago. LUMA is a joint venture between ATCO, a Canadian company whose subsidiaries engage in natural gas extraction, and Houston-based Quanta Services. Since LUMA's takeover, blackouts have persisted and even intensified at some times and in some areas. Electricity customers in Puerto Rico have also reportedly suffered from skyrocketing bills for unreliable service.

### C.      FEMA's Puerto Rico Fossil Grid Entrenchment Project

86. In August of 2020, almost three years after Hurricane Maria, FEMA announced the Puerto Rico Fossil Grid Entrenchment Project and issued the Draft Fossil Grid Entrenchment PEA for public comment. The PEA covers work such as rebuilding or relocating transmission and distribution lines and repairing and "hardening"—in other words, strengthening so they may better survive the next storm—utility poles, towers, and substations.

87. In the PEA, FEMA defines the purpose of the Fossil Entrenchment Project as being "to provide grant funding to restore damaged utilities [in the Commonwealth of Puerto Rico], and increase their resiliency for future weather events." The Purpose and Need section of the PEA goes on to explain:

> "Geography, climate, and demographic trends have led to the development of a complex infrastructure of utility systems across Puerto Rico. Aging infrastructure, the need for increased capacity, and damage due to disaster events all have the potential to limit the ability of these utility systems to function as designed. Failure of these systems can cause injury, loss of life, and environmental issues."

88. The PEA then articulates the need for FEMA's Project as:

> "[T]o re-establish a safe and reliable network of utilities (through repair, replacement, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading

damaged utilities in accordance with current engineering codes and standards.
The grant funding is necessary to address these concerns and reduce the damage
and disruption caused by future disasters throughout the Commonwealth."

89.  FEMA includes four alternatives in its PEA. The first is a "No Action" alternative,

under which FEMA would not provide grant funding and the local governments of Puerto Rico

would fund the Fossil Entrenchment Project from other sources. The second is a "Replacement"

alternative, which involves the repair, replacement, and upgrading of the existing, centralized

utility system. The third is a "Realignment or Relocation" alternative, which involves realigning

or relocating utilities, as well as the installation of on-sight fossil-fueled backup generation.

Finally, the fourth alternative is "some combination" of the first three. FEMA fails to identify

deploying distributed renewable energy as a component of any of these alternatives.

90.  Plaintiffs submitted extensive comments on the Draft PEA, raising a host of concerns

about FEMA's failure to consider a distributed renewable energy alternative and the inadequacy

of its environmental impacts analysis, and urging FEMA to prepare an EIS. In the summer of

2021, FEMA instead finalized the PEA and issued a FONSI, determining that the agency's

preferred alternative—alternative four, "some combination" of replacement, realignment or

relocation, and no action—best fulfilled the purpose of need of the PEA and would have no

significant impact on the quality of human health and the environment, and that an EIS was not

necessary. The final PEA did not adopt the distributed renewable energy alternatives that

Plaintiffs suggested.

91. On information and belief, FEMA has authorized funding for the following projects,

among others, pursuant to the PEA:

- Roughly $18 million for "immediate" repairs to gas turbines at the Mayaguez
  Hydro-Gas Power Plant that have been out of service since September 2020.

- Almost $1 million for permanent repairs to the Cambalache Power Plant in Arecibo, including repairs to the plant's water pumping system and storm water pump system.

- $3 million for improvements to the wastewater treatment plant at the Aguirre Power Plant near Guayama.

- Almost $2.5 million for replacing circuit breakers at the Manati TC switchyard that are "beyond useful recommended service life, are obsolete, or unreliable."

### D.    FEMA's Puerto Rico Public Facilities Project

92. In July 2022, almost 5 years after Hurricanes Irma and Maria, FEMA issued another PEA addressing public facilities in Puerto Rico damaged by the storms ("Public Facilities PEA"). The Public Facilities PEA identifies emergency response facilities like police and fire stations, hospitals and other healthcare facilities, and public housing communities as among the kinds of public facilities for which the project would fund repair, replacement, or relocation.

93. The Public Facilities PEA defines the purpose of the proposed program as to "restore Puerto Rican public facilities and their functions to meet the post-disaster needs of subrecipients and increase their resiliency in response to future disaster events." The PEA goes on to frame the need for the program as follows:

> "The need for this action is to repair public facilities to current codes and standards, equitably restore or increase resiliency measures, reopen facilities closed as a result of disaster events, support alignment to subrecipient needs of restoring facility services, align facilities with local laws, and provide hazard mitigation to increase resiliency in response to future disaster events."

94. The Public Facilities PEA acknowledges that a critical part of the damage to Puerto Rico's public facility infrastructure resulting from the hurricanes had to do with the archipelago's electricity grid. According to the PEA, three months after Hurricane Maria more than a third of the hospitals in Puerto Rico were still without electricity, and nearly a year after

the storm more than 10% of the permanent healthcare facilities in the archipelago were still depending on backup generators.

95. Similar to the Fossil Entrenchment PEA, the Public Facilities PEA considers four alternatives: a no action alternative, a "Repair of Public Facilities with Added Resiliency Measures" alternative, a "Relocation of Public Facilities" alternative, and a fourth alternative which was a combination of alternatives 2 and 3. FEMA states that typical actions FEMA will fund under the Public Facilities PEA include replacing or hardening existing onsite utility networks, including electric power networks. The Public Facilities PEA considers distributed renewable energy resources, such as solar microgrids, only as sources of backup power for critical public facilities when the existing fossil fuel grid fails.

96. Plaintiffs submitted extensive comments on the draft Public Facilities PEA, again raising a series of concerns about FEMA's failure to consider a distributed renewable energy alternative and the inadequate analysis of environmental impacts, and urging FEMA to prepare one comprehensive EIS holistically assessing its overall plans for Puerto Rico's electricity grid. Instead, in December of 2022, FEMA finalized the Public Facilities PEA and issued a FONSI. The final PEA did not adopt the distributed renewable energy alternatives that Plaintiffs suggested.

### E.     The PEAs' Failure to Meet NEPA's Basic Requirements

### 1.     *The Fossil Grid Entrenchment PEA's Flawed Purpose and Need Discussion*

97. By defining the purpose of the Fossil Grid Entrenchment Project as being to "provide grant funding to restore damaged utilities and increase their resiliency for future weather events,"

FEMA focuses exclusively on pre-existing utilities as they were in Puerto Rico prior to Hurricane Maria in 2017, and on the narrow purpose of restoring those utilities.

98. Because Puerto Rico's electric grid prior to Hurricane Maria was centralized and largely fossil fuel-based, defining the purpose of the Fossil Entrenchment Project in this unduly narrow way results in a myopic focus on rebuilding, relocating, and hardening the centralized, fossil fuel-enabling grid, rather than considering the possibility of meeting the objective of providing the archipelago's residents with safe and reliable electricity and increasing their resiliency to future weather events by funding projects aimed at installing distributed renewable energy such as rooftop solar, solar microgrids, battery storage, energy efficiency retrofits, weatherization, and other renewable energy and energy efficiency measures.

99. In the Fossil Entrenchment PEA, FEMA acknowledges that Puerto Rico's centralized grid and aging fossil energy infrastructure is highly susceptible to damage from disasters that not only results in environmental harms, but also can be life-threatening for vulnerable citizens and communities.

100. For example, loss of power can leave elderly, young, and sick residents without access to medical care, air conditioning or potable water during dangerous heat waves. As the Fossil Entrenchment PEA states, it can also leave local governments "unable to provide critical services including fire suppression, emergency communication, power generation, potable water, and wastewater treatment."

101. This is particularly true in Puerto Rico because, according to a University of Texas at Austin study, the archipelago is "among the world's most vulnerable regions to the effects of climate change." The kinds of disasters to which Puerto Rico's antiquated and highly centralized grid are so susceptible are only going to become more and more intense in the coming years.

102. Nonetheless, FEMA has framed the purpose of its Project with a narrow focus on repairing, rebuilding, and relocating the pre-existing centralized electricity delivery system, excluding consideration of cleaner and more resilient alternatives to the fossil-fuel enabling system Puerto Rico has relied on to date.

### 2. Both PEAs' Flawed Alternatives Analyses

103. The Fossil Entrenchment PEA fails to consider reasonable alternatives, including alternatives in which FEMA funds would be used for investing in distributed renewable energy as a primary source of power, and/or energy efficiency measures.

104. Instead, it only explores alternatives that assume continued reliance on the existing centralized grid—either by repairing, replacing, the grid in current locations, by moving elements, or some combination of the two.

105. As a result, the Fossil Entrenchment PEA fails to consider the relative environmental impacts that would be associated with fulfilling more of Puerto Rico's energy needs with distributed renewable energy and/or projects like energy efficiency that would reduce electricity demand.

106. FEMA's alternatives analysis in its Public Facilities PEA similarly fails to consider an alternative in which distributed renewable energy serves as the primary source of electricity for public facilities in the archipelago. To the extent the Public Facilities PEA considers distributed renewable alternatives at all, it is only as a potential source of backup power when the centralized grid is down.

107. As Plaintiffs detailed in their comments on both PEAs, these alternatives would reduce the need to continue repairing, rebuilding, and relocating infrastructure destroyed every time there is a new storm. They would simultaneously avoid short- and long-term pollution

associated with rebuilding, relocating, or otherwise repairing, and then continuing to rely on, centralized T&D and fossil fuel-powered electricity infrastructure.

108. Alternatives that prioritize distributed renewable energy, battery energy storage, and energy efficiency retrofits would also make Puerto Rico's electricity grid and its critical public facilities more resilient to future disasters—including those caused or worsened by the climate crisis—by making them less reliant on long distance transmission lines through mountainous and heavily vegetated regions. If an extreme weather event takes a large, centralized facility or transmission line out of service, decentralized energy sources may not be affected at all. In addition, distributed energy can be used to create "islandable" generation that operates even when outages occur. This would minimize and even avoid risks to human health and life that result from power outages. For example, a 2017 National Academies report recommended a more distributed energy generation architecture in Puerto Rico to limit or prevent widespread outages.

109. By displacing existing greenhouse gas polluting sources, alternatives that address Puerto Rico's electricity needs by prioritizing distributed renewable energy, battery energy storage and energy efficiency—and that ensure the archipelago's critical public facilities rely primarily on such resilient resources—would also help ameliorate future disasters exacerbated by the climate emergency, which is caused by greenhouse gas emissions.

110. Under Puerto Rico's 2019 Energy Public Policy Act, Act 17, PREPA is required to dramatically reduce the use of fossil fuels and minimize greenhouse gas emissions in the coming years. FEMA's failure to consider alternatives that prioritize distributed renewable energy as a primary source of power, battery energy storage and weatherization and other energy efficiency measures that reduce demand and thereby potentially reduce the need to repair, rebuild, or

relocate existing infrastructure and facilities, also make the Fossil Entrenchment Project and the Public Facilities Project incompatible with the Puerto Rico's renewable energy goals.

### 3.    Both PEAs' Flawed Environmental Analyses

111. Both PEAs also fail to engage in meaningful analysis of the environmental effects of the alternatives they do consider.

*Air Pollution Impacts*

112. Puerto Rico currently has multiple non-attainment and maintenance areas for a number of criteria pollutants under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*—in other words, geographic areas found to have a particular pollutant in amounts exceeding National Ambient Air Quality Standards under the CAA, or that were previously found to be in non-attainment but were redesignated subject to the requirement to develop a maintenance plan. Those pollutants include lead, sulfur dioxide, and particulate matter (PM10).

113. These are dangerous substances. Lead is a highly potent neurotoxin that can irreversibly damage the brain and nervous system, resulting in slowed growth and development, learning and behavior problems, and hearing and speech problems. Sulfur dioxide can have a range of harmful effects on the lungs and is particularly dangerous for people with asthma. It can also contribute to the formation of smog, which irritates airways and can increase the risk of serious heart and lung disease. Studies have linked exposure to particulate matter pollution with irregular heartbeats, aggravated asthma, decreased lung function, heart attacks, and even premature death.

114. The Fossil Entrenchment PEA acknowledges that repairing existing fossil fuel utility infrastructure may result in short-term increases in these emissions. However, FEMA makes a cursory assumption that the impacts from such emissions will be minor because the

equipment will be well-maintained and comply with applicable standards, and that mitigation measures such as dust suppression techniques will be followed and be completely effective in addressing any impacts that do occur.

115. The Fossil Entrenchment PEA also asserts that long-term air quality impacts will not occur. But FEMA's analysis does not consider any alternatives that do not involve continued reliance on Puerto Rico's preexisting centralized grid, as compared to alternatives in which fossil fuel consumption on the archipelago is reduced. For example, the fossil fuel-fired power plants in Puerto Rico emit a tremendous amount of sulfur dioxide and are significant contributors to violations of sulfur dioxide emission standards in the archipelago. The PEA fails to consider any long-term air quality impacts from continued reliance on those facilities, or the relative benefits from an air quality standpoint of alternatives that rely instead more heavily on distributed renewables.

116. The Public Facilities PEA similarly asserts negligible air quality impacts based on a conclusory assertion that all equipment will be well maintained and comply with applicable standards, and that mitigation measures such as dust suppression techniques will be followed and be completely effective.

117. Also like the Fossil Entrenchment PEA, the Public Facilities PEA does not consider any alternatives in which public facilities in the archipelago do not continue to rely on fossil fuel-based electricity, and does not consider the relative benefits to air quality of alternatives in which public facilities rely primarily on distributed renewables.

*Water Quality Impacts*

118. The Fossil Entrenchment PEA and the Public Facilities PEA both acknowledge that Puerto Rico already has hundreds of designated instances of pollutants impairing water quality

throughout the archipelago, including pollutants from industrial point sources like fossil-fuel-fired power plants.

119. Activities funded pursuant to the Fossil Entrenchment PEA will result in further harm to Puerto Rico's water resources in a number of ways. Construction activities to repair or relocate infrastructure frequently include discharges of fill material that impair water quality and damages wetlands, and also harms coral habitats when those discharges reach the ocean. Furthermore, fossil fuel-fired power plants release various pollutants, such as excess nitrogen, that get into water supplies and contribute to harmful blooms of algae and sargassum.

120. Relying on fossil fuel power plants also requires constant transportation of fuel to these plants. But transportation of fossil fuels by tanker or by pipeline can result in environmentally destructive spills. For example, in 1994 a tanker carrying fuel oil collided with a reef near San Juan, Puerto Rico, spilling tens of thousands of gallons of oil and severely impacting wildlife and sensitive habitats, as well as sensitive historical sites and tourism.

121. Although FEMA acknowledges that activities funded under the Fossil Entrenchment PEA may result in adverse impacts to water quality, it again makes a conclusory assumption that all such impacts will be minor or negligible, and that local and federal requirements will be completely effective in mitigating any impacts that do occur.

122. Activities funded pursuant to the Public Facilities PEA will have many of the same impacts on water quality. Construction on repair projects, and particularly relocation activities, for public facilities will lead to discharge of fill material and impair water quality, damage wetlands, and harm corals. Investing in making public facilities in the archipelago continually reliant on fossil fuels will also result in continued pollution and spills of the kinds referenced above.

*Climate Consequences*

123. Climate change is multiplying exactly the kinds of threats FEMA is charged with addressing, particularly in locations like Puerto Rico that are especially vulnerable to climate impacts.

124. The climate crisis is fueling more destructive hurricanes. For example, scientists estimate that global warming made Hurricane Harvey's record rainfall in August of 2017—just weeks before Hurricanes Irma and Maria—3.5 times more likely, and that the storm's total rainfall was 15-38% higher than it would have been without global warming. Rising sea levels resulting from fossil-fuel caused climate change are also causing higher storm surge—walls of water pushed onto the coast when storms occur.

125. Puerto Rico experienced these effects when Maria hit in 2017. Scientists found that a storm of Maria's magnitude is nearly five times more likely today than it was in the 1950s because of warmer air and ocean water caused by the climate crisis. Hurricane Fiona fit this same pattern of massive rainfall fueled by climate change, with some parts of the territory receiving even more rain than they did during Hurricane Maria.

126. Puerto Rico is experiencing other climate change impacts as well. It is already experiencing significantly more hot days, rising sea levels, and coastal erosion, with these problems expected to only worsen in coming years. Although the climate emergency will make heavy rainfalls more common in Puerto Rico, it is likely that total rainfall will decrease in the Caribbean as a result of climate change. Warmer temperatures also increase the rate at which water evaporates. These factors together mean that, paradoxically, Puerto Rico may also face an increased risk of drought. This, in turn, may result in increased risk of wildfire in the archipelago.

127. The CEQ has identified climate change as a relevant factor that should be considered in NEPA reviews. Nonetheless, the Fossil Entrenchment PEA and the Public Facilities PEA both fail to consider the climate change impacts of the alternatives considered. The Fossil Entrenchment PEA does not mention the climate crisis at all, despite the relevance of climate risks both to Puerto Rico and to FEMA's mission.

128. In both PEAs, FEMA also fails to consider how climate change will affect its proposed action. Reconstructing existing powerlines—even if they are reinforced—will not address the fundamental problem that those lines must traverse long, mountainous, and heavily vegetated distances to bring power from the primary generation sources in the south to the primary electricity needs in the north. The power grid will continue to be highly vulnerable to winds from hurricanes that typically traverse the island from east to west. Nor will burying power lines fully address climate vulnerability. Buried power lines, which are multiple times more expensive, are also more susceptible to flooding and corrosion by salt water, problems which are also expected to increase as a result of the climate crisis.

129. Similarly, simply repairing public facilities' connection to the existing fossil fuel grid will not prevent harm resulting from power outages at those facilities when the grid inevitably goes down again in another climate change-fueled storm. The Public Facilities PEA fails to consider how ensuring these facilities rely on distributed renewable energy, like rooftop or community-based solar microgrids with battery storage, can make them more resilient to climate change.

130. Both projects, but particularly the Fossil Entrenchment Project, will also actively exacerbate the climate crisis. Most critically, by committing billions of federal dollars to rebuild and reinforce Puerto Rico's centralized fossil fuel-reliant electricity system, the Fossil

Entrenchment Project will necessarily prolong the archipelago's dependence on fossil fuels and lock in years if not decades worth of unnecessary greenhouse gas emissions and co-pollutants that overburden nearby communities.

131. For example, as commenters explained, the Fossil Entrenchment Project will certainly result in increased and prolonged demand for liquified natural gas ("LNG") in Puerto Rico, resulting in additional greenhouse gas emissions and induced demand for more natural gas drilling and extraction, as well as a host of other environmental concerns. None of this is addressed in the Fossil Entrenchment PEA.

*Environmental Justice Impacts*

132. The Fossil Entrenchment PEA and the Public Facilities PEA both fail to adequately address the potential environmental justice impacts of the projects under consideration—a required part of an agency's NEPA review.

133. Both PEAs fail to adequately consider the impacts that the public health air, land, and water pollution from the construction, relocation, and continued operation of projects under the PEAs will have on already overburdened environmental justice communities. At every stage of their life cycle—extraction, processing, transport, and combustion—fossil fuels generate harmful pollutants, including known cancer-causing chemicals like benzene and formaldehyde, ozone-forming chemicals like nitrogen oxides, volatile organic compounds, heavy metals like lead, and particulate matter including black carbon and silica dust that cause lung and heart disease. Burning coal also produces large amounts of coal ash, which contains mercury, cadmium, and arsenic, and which makes its way into waterways and contaminates drinking water supplies. Puerto Rico has a number of coal ash waste sites.

134. In Puerto Rico, as elsewhere, these fossil fuel pollutants disproportionately impact communities of color, low-income, and low-wealth communities. For example, the AES coal-fired power plant in Guayama and the Aguirre Power Complex in Salinas, both in southeastern Puerto Rico, are two primary sources of fossil fuel pollution located near some of the archipelago's poorest communities.

135. The Public Facilities PEA acknowledges that "long-term beneficial cumulative impact on air quality would occur if inclusion of renewable energy microgrids occurs throughout Puerto Rico," but neither it nor the Fossil Entrenchment PEA meaningfully consider the pollution burden for environmental justice communities in the archipelago that will result from reinvesting in and perpetuating dependence on the existing fossil fuel-based electricity system that FEMA's preferred alternatives in both PEAs involve. Nor does either PEA adequately consider the relative benefits in terms of avoided pollution to environmental justice communities of an alternative in which FEMA invests in distributed renewable energy as a primary source of power across the archipelago, including for critical public facilities.

136. Likewise, neither PEA considers how the climate change impacts of the projects it authorizes will affect environmental justice communities in Puerto Rico. The harms from climate disasters are not felt equally, but instead are disproportionately felt by Black, Latino, Indigenous, and low-wealth communities. Black, Latino, and low-income households are more likely to live in high climate-risk areas like heat domes, flood zones, and hurricane-prone areas. These communities tend to be particularly vulnerable to climate change impacts like more frequent extreme heat and poor air quality, as well as to the health impacts those events cause, such as cardiovascular and respiratory complications, renal failure, and preterm birth.

137. The Fossil Entrenchment PEA in particular also fails to consider how reconstructing Puerto Rico's outdated and inefficient fossil fuel-based electricity grid will cement the problems that have led to that grid being so unreliable—problems which disproportionately affect environmental justice communities. The continued necessity for transmission lines to traverse long distances from generation centers in the south to population centers in the north through mountainous and heavily vegetated terrain will leave environmental justice communities particularly vulnerable to all the human health and safety concerns associated with frequent and prolonged blackouts.

138. The Public Facilities PEA acknowledges that solar microgrids can improve resilience but, as previously stated, only considers microgrids as backup power. And, even within that framework, FEMA does not consider whether deployment of renewable-based microgrids could provide backup power to both a public facility and the surrounding community, allowing both to have their critical power needs met during grid failures and providing especially crucial resilience benefits for environmental justice communities.

139. Finally, neither PEA considers how perpetuating reliance on the fossil fuel-based grid may make electricity bills in Puerto Rico both higher and more unstable than they would be if FEMA invested in a distributed renewable energy alternative, or how this may affect the relative environmental justice impacts of FEMA's preferred alternatives.

*Cultural and Historic Resources Impacts*

140. In the Fossil Entrenchment PEA, FEMA does not specifically consider the extent to which the overarching Project and its associated work like access road projects would impact cultural and historic resources. While it catalogues the existence of historic, cultural, and archeological resources and regions across Puerto Rico generally, it does not do any analysis of

40

Project impacts to cultural and historic resources, despite acknowledging that the Fossil Entrenchment Project has a "high potential for adversely affecting historic properties."

141. The Public Facilities PEA does assess potential impacts to historic buildings, including vibrations from construction equipment and relocation or abandonment of historic buildings. FEMA concluded that short and long-term major impacts to such properties will occur, but makes a cursory assumption that treatment measures will limit all impacts to moderate or minor, without providing any details.

*Threatened and Endangered Species Impacts*

142. Both the Fossil Entrenchment PEA and the Public Facilities PEA also fail to take the requisite hard look at the impacts both projects will have on threatened and endangered species.

143. The 2017 hurricanes and Hurricane Fiona caused tremendous damage and stress to critical habitats in Puerto Rico—including wetlands, dunes, beaches, coral reefs, seagrasses, and forests—and to the species that depend on them. This damage adversely impacted many of the federally listed threatened and endangered species that make Puerto Rico and its waters home. These consequences include direct loss of individuals, habitat loss or changes in habitat structure or function, and increased predation and competition from invasive species. Habitat for the critically endangered Puerto Rican parrot, hawksbill turtle, and sharp-shinned hawk, among many others, was decimated by the storms. The listed coral species *Acropora cervicornis* and *Orbicella annularis*, which are both major contributors to nearshore reefs that provide critical protection to coastlines from storm surge and waves, were also severely impacted by the hurricanes. Even before Hurricane Fiona, the loss or decline of native species that has resulted from Hurricanes Irma and Maria has created a void that invasive, non-native species are rapidly filling.

144. Activities carried out under the Fossil Entrenchment Project and the Public Facilities Project will exacerbate these harms. Several threatened or endangered species of bird and coral in Puerto Rico are particularly likely to be affected. The elfin woods warbler (*Setophaga angelae*), listed as threatened in 2016, is found, among a few other places, in the Maricao Commonwealth Forest. Transmission lines appear to cut across the Maricao Commonwealth Forest, and any utility repair, replacement, upgrading, or relocation activities in the vicinity have the potential to adversely affect this species. Elfin woods warblers utilize dense vegetation, typically closed-canopy, high-elevation forests with a well-developed understory. Loss and fragmentation of this habitat to urbanization are central causes of the species' decline. In the listing decision for the elfin woods warbler, the Fish and Wildlife Service ("FWS") references "development of infrastructure for utilities and communications" and associated road construction as activities that negatively affected warbler habitat. Expansion of existing utility infrastructure also may degrade suitable habitat for the warbler. Given its already restricted distribution, habitat modification presents a significant threat to the species' persistence. The warbler's restricted distribution also leaves it increasingly vulnerable to storms and other threats associated with the climate crisis, which will be exacerbated by continued reliance on fossil fuel-based electricity, but the PEAs fail to address these concerns.

145. The endangered Puerto Rican parrot (*Amazona vittate*)—the only parrot native to the United States, and one of the world's most endangered bird species—has a current range that is restricted to the El Yunque National Forest and the Rio Abajo Forest. Transmission lines appear to cut across the Rio Abajo Forest area, and any utility repair, replacement, upgrading, or relocation activities in the vicinity have the potential to adversely affect the Puerto Rican parrot. Climate-fueled hurricanes also pose a threat to this highly endangered species. Indeed, "[g]iven

the small size of the wild population, a single strong hurricane could potentially wipe out the entire current wild population." Continued reliance on centralized T&D and fossil fuel-based energy as proposed in both PEAs increases the likelihood of these intense storm events and consequent necessary repair work on Puerto Rico's utility and public facility infrastructure, but the PEAs fail to address these issues.

146. The Puerto Rican nightjar (or whip-poor-will)(*Caprimulgus noctitherus*), listed as endangered in 1973, was restricted to dry, closed-canopy, semideciduous forests in the southern portion of the main island including Guánica Commonwealth Forest, Susua Forest, and Guayanilla Hills as of the mid-1980's when the recovery plan for the species was drafted. Portions of occupied nightjar habitat appear heavily impacted by utility infrastructure. Habitat modifications that flow from repair, replacement, or relocation activities in the vicinity have the potential to have "significant negative effects on the species." The FWS has stated that "[t]he sedentary nature of this species and its link to mature, closed-canopy forest provides little room for what proponents may visualize as minor habitat modifications." FEMA failed to describe how the activities covered by either PEA would affect the species and its habitat—specifically the coastal dry forests and lower cordillera forests of Susúa and Guánica that are crucial to the nightjar's recovery.

147. The yellow-shouldered blackbird (*Agelaius xanthomus*), listed as endangered in 1976, occurs from southwestern through eastern Puerto Rico, including Boquerón Commonwealth Forest, Salinas, Roosevelt Roads Naval Station. These areas are crisscrossed with utility infrastructure and any habitat modifications that flow from repair, replacement, expansion, or relocation activities in the vicinity have the potential to harm this species. Severe storms also pose a threat to yellow-shouldered blackbirds, contributing to nest failure and

mortality. Continued reliance on fossil fuel-based energy as proposed in both PEAs increases the likelihood of intense storm events including hurricanes that will adversely impact the yellow-shouldered blackbird, but the PEAs failed to consider these issues.

148. The Fossil Entrenchment PEA acknowledges that activities related to the Project—particularly those involving relocating utilities and therefore potentially doing construction work in previously undisturbed areas—may have adverse short- and long-term impacts on federally listed threatened or endangered species, proposed or candidate species, and their designated critical habitats. However, the PEA does not assess or evaluate the impacts of the Fossil Entrenchment Project on any of the bird species listed above—nor indeed on any of the species and habitats it identifies. Instead, the PEA makes a conclusory statement that the adverse impacts will be negligible to minor.

149. FEMA also declined to consider marine species in the Fossil Entrenchment PEA at all, asserting that the Project will not have any impacts in the oceans surrounding Puerto Rico, despite commenters explaining that the Project will inevitably have direct and indirect impacts on Puerto Rico's ocean environment and marine species.

150. Corals, in particular, stand to be significantly harmed. Seven species of corals that occur off Puerto Rico are listed under the ESA: elkhorn coral (*Acropora palmata*), staghorn coral (*A. cervicornis*), boulder star coral (*Orbicella franksi*), mountainous star coral (*O. faveolata*), lobed star coral (*O. annularis*), rough cactus coral (*Mycetophyllia ferox*), and pillar coral (*Dendrogyra cylindrus*). Sedimentation and runoff from land development degrade coral habitat and contribute to the species' endangerment; harms are particularly acute for sunlight-reliant species like elkhorn and staghorn corals. As the National Marine Fisheries Service explained in the elkhorn and staghorn coral recovery plan, "heavy sedimentation is associated with lower

coral species richness and abundance, lower growth rates, decreased calcification, decreased net productivity, and lower rates of coral recruitment." Coral reefs off Puerto Rico are at increased risk of sediment accumulation due to the steep island topography, which leads to sediment-heavy runoff. Corals also are particularly sensitive to climate change effects including ocean warming, acidification, sea level rise, and increased storm events.

151. FEMA did not consider the extent to which pollution from construction and operation of projects under the Fossil Entrenchment Project will runoff into the marine environments around the islands and affect marine habitats and species, including the above-identified coral species. The Fossil Entrenchment PEA also did not consider the impacts of induced effects like additional dredging projects around the islands to allow more tanker traffic.

152. The Public Facilities PEA's analysis of impacts on threatened and endangered species and their habitats is similarly lacking. Much like the Fossil Entrenchment PEA, the Public Facilities PEA acknowledges that there will be adverse short and long-term impacts on listed species. However, it does not assess or evaluate any of the impacts on the species it identifies. Instead, it makes a conclusory assertion that the impacts will be negligible or minor, and that future consultations with FWS and conservation measures will minimize impacts. Also like the Fossil Entrenchment PEA, the Public Facilities PEA does not consider effects from pollution runoff, or induced effects like additional dredging.

*Cumulative Impacts*

153. In addition to examining direct and indirect impacts of an action, NEPA also requires that FEMA take a hard look at cumulative impacts. Cumulative impacts can "result from individually minor, but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.1(g)(3). Both PEAs assume that the activities they analyze will have minor

environmental impacts based in significant part on FEMA's claim that any site-specific activities that may have significant impacts will undertake further NEPA review and impacts will be more carefully assessed at that stage. This approach allows projects with individually small but cumulatively major impacts on the environment and species to potentially proceed without any further environmental review at all.

154. The Fossil Entrenchment PEA allows a given project to disturb up to two acres of undeveloped land and up to five acres of previously disturbed land without further environmental review. It places no limitation on the number of projects that may disturb that amount of land simultaneously, in close proximity, or in total. It also authorizes "[u]pgrading or rebuilding up to 20 linear miles of pipeline, transmission or distribution line" on an island that is 35 miles long by 100 miles wide without requiring any additional analysis.

155. The PEA acknowledges that the Fossil Entrenchment Project may result in multiple utility projects being under construction in the same area at the same time, and that this may result in adverse cumulative impacts "to resources such as vegetation, water quality and soil," as well as in terms of "traffic delays and congestion, noise, and social services." The PEA summarily dismisses these concerns, simply stating that these cumulative impacts will be short-term and less than major.

156. The PEA also fails to consider potential significant cumulative air pollution impacts from the construction and operation of multiple concurrent projects in the same area. It similarly fails to consider cumulative impacts on federally listed threatened and endangered species and their critical habitats from the construction and operation of multiple projects under the Fossil Entrenchment Project's sweeping umbrella.

157. The Public Facilities PEA suffers from the same defects. Much like the Fossil Entrenchment PEA, the Public Facilities PEA allows for up to two acres disturbance in rural areas and up to 5 acres disturbance in urban areas without any further environmental review, and without any limit on how many projects can result in such disturbances simultaneously or within the same area. FEMA acknowledges that "[r]ecently completed, ongoing, and planned temporary and permanent projects would add impacts to the same resources as those discussed in this PEA." In particular, the Public Facilities PEA acknowledges air emissions, decreased water quality, increased production of hazardous waste, and long-term adverse impacts to water, biological, air, and cultural resources, and to communities with environmental justice concerns, as potential long-term cumulative impacts.

158. Despite this, the Public Facilities PEA makes the conclusory assertion that the action alternatives it analyzes will not result in significant cumulative impacts. It fails to explain why the cumulative impacts of the Public Facilities Project will be minor, particularly since multiple projects may be carried out pursuant to the Public Facilities PEA in close physical proximity at the same time.

### 4.    *FEMA's Improper Refusal to Prepare a Single, Comprehensive EIS*

159. FEMA's Fossil Entrenchment Project will involve billions of dollars and the "repair, replacement, and realignment" of utility infrastructure across and throughout Puerto Rico. FEMA expressly acknowledges that this will include, among other things, repairing, rebuilding, or relocating miles of pipeline and may require new rights of way.

160. FEMA's Public Facilities Project will likewise involve a huge number of buildings and other facilities across the entire archipelago, including hospitals and clinics, police and fire stations and other emergency response facilities, education facilities, city halls, municipal service centers and other government offices, churches and other houses of worship, judiciary, buildings,

correctional facilities, libraries, museums, and more. Further, the Public Facilities PEA explicitly allows for expanding facility function, capacity, and density by up to 20%, and for ground disturbance of up to 2 acres at rural sites and 5 acres at urban sites.

161. With respect to both PEAs, commentors urged FEMA to recognize that the potential impacts of the alternatives considered are significant and not conducive to mitigation to "less than major" impacts that could support a finding that an EIS is not necessary.

162. Rejecting these concerns, in both cases FEMA issued a short and conclusory FONSI finding that the agency has determined that the evaluated actions will have no significant impact. In both cases, the agency failed to explain why the presence of several NEPA significance factors do not require the preparation of an EIS, including the precedent of an EA on this kind of project, controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources, and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

163. With respect to both PEAs, commentors pointed out that the environmental impacts of the projects discussed would be significant, cumulative, and warrant the preparation of an EIS. With respect to the Fossil Entrenchment PEA, FEMA inexplicably responded that an EIS was not necessary because it had not yet received any individual project proposal in Puerto Rico whose impacts "cannot be mitigated to lower levels" through permitting restrictions, consultation with other agencies, or imposition of project conditions. This fails to explain why the Fossil Entrenchment Project as a whole does not require an EIS. With respect to the Public Facilities PEA, FEMA did not provide a specific response to commentors as to why it concluded no EIS was warranted.

164. With respect to the Public Facilities PEA in particular, commentors argued that, because the Public Facilities PEA contemplates projects involving repairing the connections of public facilities in Puerto Rico to the centralized fossil fuel-based electricity grid—overall repairs to which are a major subject of the Fossil Entrenchment PEA—the two actions are significantly connected and require the preparation of a single, comprehensive EIS. FEMA's response to this comment pointed to its expectation that it will take the agency years to fully fund the Public Facilities project, and referenced possible future EISs, but failed to explain why the current evident connected nature of these two projects do not require the preparation of a single, comprehensive EIS.

F.    **FEMA's Failure to Undertake Further NEPA Review in Light of Significant Developments Since the Issuance of the FONSIs.**

165. On information and belief, FEMA has yet to approve many specific projects or disperse most of the funds obligated under the umbrella of these two PEAs. In the meantime, several developments since the issuance of the Fossil Entrenchment PEA FONSI in 2021 raise serious concerns regarding the analysis included in that PEA, and necessitate that FEMA, at minimum, supplement its NEPA review. NEPA requires that an agency "shall" supplement the review where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d).

166. On January 6, 2023, Plaintiffs sent FEMA a letter detailing important new developments and urging FEMA to agree that it would undertake supplemental NEPA review at this time.

167. The letter first explained serious concerns related to LUMA Energy, which has now taken over management of the archipelago's electric transmission and distribution system. As

referenced above, LUMA has had numerous performance issues calling into question its ability

to effectively repair utility infrastructure as FEMA assumes in the Fossil Entrenchment PEA.

Under LUMA's management of the T&D system, residents have experienced frequent blackouts

while electricity bills have soared.

168. These issues have been so significant that in September 2022, the New York

Attorney General urged federal authorities to launch an investigation to address the company's

performance. Among other concerns, LUMA's Monacillo substation suffered a fire that left

900,000 customers without power; a fire at the Costa Sur power plant caused a complete outage

in April 2022; and additional widespread failures and outages have occurred.

169. The apparent inability of the company charged with rebuilding the centralized fossil

fuel power system to operate safely or keep electricity bills stable seriously undermines the

rationale in the 2021 FEMA PEA to spend billions of dollars to rebuild that system rather than

pursue viable alternatives, and calls into question the continued validity of the Fossil

Entrenchment PEA's assessment of the environmental and justice impacts of the chosen

alternative.

170. Plaintiffs' January 6 letter also explained that additional research and data since the

Fossil Entrenchment PEA was finalized further demonstrates how FEMA could rely on

distributed solar and related technologies to serve electricity needs rather than pouring money

into the vulnerable centralized power system.

171. For example, one recent analysis shows that Puerto Rico could achieve 75%

distributed renewable energy generation within 15 years, with minimal upgrades to the

distribution system, and that a 75% distributed renewable energy scenario is less expensive than

the current grid. These new analyses seriously undermine FEMA's cursory rejection of these

alternatives in both PEAs, and call for supplemental NEPA review to consider these alternatives and compare their environmental impacts with FEMA's original chosen alternative.

172. Finally, Plaintiff's January 6 letter explained that Hurricane Fiona in September 2022, and its aftermath, also warrants further NEPA analysis. Although Hurricane Fiona hit as a relatively small Category 1 storm, it caused heavy flooding and landslides and knocked out the archipelago's entire electric grid yet again. Fiona is just the latest in a series of devastating storms that have repeatedly ravaged the archipelago and exposed the high vulnerability of its centralized grid.

173. As detailed in Plaintiffs' recent letter, any single one of these developments would be sufficient for FEMA to undertake supplemental NEPA review as significant new circumstances or information relevant to environmental concerns raised by the projects proceeding under both PEAs, pursuant to which FEMA is pouring billions into rebuilding the status quo centralized T&D and fossil fuel power system and into perpetuating Puerto Rico's public facilities' dependence on that system. Taken together, these developments demand that FEMA re-open the issues considered in the two PEAs and reconsider both the environmental impacts of its approach, and reasonable alternatives.

174. On January 25, 2023, FEMA sent a response to Plaintiffs' letter in which the agency refused to undertake supplemental NEPA review at this time. FEMA's reply acknowledged a number of the points Plaintiffs made in their January 6 letter but declined to commit to any specific further NEPA actions, including supplemental NEPA.

## FIRST CLAIM FOR RELIEF

## VIOLATIONS OF NEPA FOR ISSUING AN INADEQUATE ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT FOR THE PUERTO RICO FOSSIL GRID ENTRENCHMENT PROJECT

175. Paragraphs 1-174 are incorporated from this Complaint.

176. FEMA's Puerto Rico Fossil Grid Entrenchment PEA and Finding of No Significant Impact violate NEPA because the agency defined the purpose of the Fossil Entrenchment Project unreasonably narrowly, framing it as being to restore and repair the centralized grid in Puerto Rico that existed prior to the 2017 hurricanes rather than as to meet the needs of the archipelago's residents for safe, resilient, and reliable electricity.

177. The PEA failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of the Fossil Entrenchment Project and reasonable alternatives.

178. The PEA lacked sufficient evidence and adequate analysis of the environmental impacts of the Fossil Entrenchment Project to support its ultimate Finding of No Significant Impact.

179. The PEA violates NEPA's requirement that FEMA consider a reasonable range of alternatives to the proposed action.

180. The PEA and FONSI are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, see, inter alia, 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, and violate the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2).

181. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**SECOND CLAIM FOR RELIEF**

**VIOLATIONS OF NEPA FOR FAILURE TO PREPARE AN EIS FOR THE PUERTO RICO FOSSIL GRID ENTRENCHMENT PROJECT**

182. Paragraphs 1-181 are incorporated from this Complaint.

183. FEMA's Puerto Rico Fossil Grid Entrenchment Project is a major federal action within the meaning of NEPA.

184. FEMA violated NEPA by failing to prepare an Environmental Impact Statement fully analyzing the environmental impacts of the Fossil Entrenchment Project, including air pollution impacts, climate change impacts, impacts to ESA-listed terrestrial and marine animals and their critical habitats, impacts to cultural and historic resources, environmental justice impacts, and cumulative impacts. The agency also failed to explain why several NEPA significance factors do not require the preparation of an EIS, including the precedential effect of FEMA's approach; controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources; and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

185. FEMA's authorization of the Fossil Entrenchment Project without first preparing an EIS, or adequately explaining why an EIS is not necessary, is arbitrary, capricious, an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

186. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF NEPA FOR ISSUING AN INADEQUATE ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT FOR THE PUBLIC FACILITIES PROJECT

187. Paragraphs 1-186 are incorporated from this Complaint.

188. FEMA's Public Facilities PEA and Finding of No Significant Impact violate NEPA because the PEA failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of the Public Facilities Project and reasonable alternatives.

189. FEMA's PEA lacked sufficient evidence and adequate analysis of the environmental impacts of the Public Facilities Project to support its ultimate Finding of No Significant Impact.

190. The Public Facilities PEA violates NEPA's requirement that FEMA consider a reasonable range of alternatives to the proposed action.

191. The PEA and FONSI are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, inter alia, 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, and violate APA. 5 U.S.C. § 706(2).

192. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

## FOURTH CLAIM FOR RELIEF

## VIOLATIONS OF NEPA FOR FAILURE TO PREPARE AN EIS FOR THE PUBLIC FACILITIES PROJECT

193. Paragraphs 1-192 are incorporated from this Complaint.

194. FEMA's Public Facilities Project is a major federal action within the meaning of NEPA.

54

195. FEMA violated NEPA by failing to prepare an Environmental Impact Statement fully analyzing the environmental impacts of the Public Facilities Project, including air pollution impacts, climate change impacts, impacts to ESA-listed terrestrial and marine animals and their critical habitats, impacts to cultural and historic resources, environmental justice impacts, and cumulative impacts. The agency also failed to explain why several NEPA significance factors do not require the preparation of an EIS, including the precedential effect of FEMA's approach; controversial and unknown impacts to the human environment; cumulatively significant impacts; the possible loss or destruction of significant scientific, cultural, or historical resources, and adverse impacts on threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

196. FEMA's authorization of the Public Facilities Project without first preparing an EIS, or adequately explaining why an EIS is not necessary, is arbitrary, capricious, an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

197. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF NEPA FOR REFUSING TO CONDUCT SUPPLEMENTAL NEPA REVIEW**

198. Paragraphs 1-197 are incorporated from this Complaint.

199. NEPA requires an agency to conduct further environmental analysis whenever there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(d).

200. FEMA is violating NEPA by refusing to conduct additional NEPA review in connection with the Puerto Rico Fossil Grid Entrenchment Project in light of developments since the Final PEA and FONSI were issued, which were detailed in Plaintiffs' January 6, 2023, letter. FEMA's refusal to conduct supplemental NEPA review is arbitrary and capricious and an abuse of discretion, done without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

201. These violations are injuring Plaintiffs in the manner described in paragraphs 22-54 above.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

1. Declare that FEMA's Puerto Rico Fossil Grid Entrenchment Programmatic Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

2. Vacate and set aside the Programmatic Environmental Assessment and Finding of No Significant Impact FEMA issued for the Puerto Rico Fossil Grid Entrenchment Project;

3. Declare that FEMA's failure to prepare an Environmental Impact Statement for the Puerto Rico Fossil Grid Entrenchment Project, or to adequately explain why an EIS is not necessary, violates NEPA, its implementing regulations, and the APA;

4. Order FEMA to prepare an Environmental Impact Statement for the Puerto Rico Fossil Grid Entrenchment Project in compliance with NEPA;

5. Declare that FEMA's Puerto Rico Public Facilities Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

6. Vacate and set aside the Programmatic Environmental Assessment and Finding of No Significant Impact FEMA issued for the Puerto Rico Public Facilities Project;

7. Declare that FEMA's failure to prepare an Environmental Impact Statement for the Puerto Rico Public Facilities Project, or to adequately explain why an EIS is not necessary, violates NEPA, its implementing regulations, and the APA;

8. Order FEMA to prepare an Environmental Impact Statement for the Puerto Rico Public Facilities Project in compliance with NEPA;

9. Declare that FEMA's failure to conduct supplemental NEPA analysis for the Puerto Rico Fossil Grid Entrenchment Project violates NEPA, its implementing regulations, and the APA;

10. Order FEMA to conduct supplemental NEPA review for the Puerto Rico Fossil Grid Entrenchment Project;

11. Award Plaintiffs their costs for this action, including reasonable attorneys' fees; and

12. Grant such other relief as this Court deems just and proper.

Dated: April 11, 2023

Respectfully submitted,

 */s/ Augusta C.F. Wilson*
Augusta C.F. Wilson
(*Pro Hac Vice* Application Pending)
awilson@biologicaldiversity.org


 */s/ Howard M. Crystal*
Howard M. Crystal
(D.C. Bar No. 446189)
hcrystal@biologicaldiversity.org

 */s/ Anchun Jean Su*
Anchun Jean Su
(D.C. Bar No. CA285167)
jsu@biologicaldiversity.org


CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW, Suite 1300
Washington, D.C. 20005
Tel: (585) 503-8765

*Attorneys for Plaintiff*